IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, *et al.*, | § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. 3:09-CV-2206-N |
| R. ALLEN STANFORD, *et al.*, | § § § | |
| Defendants. | § | |

## ORDER

This Order addresses the cross-motions for summary judgment of Plaintiff Certain Underwriters at Lloyds of London and Arch Specialty Insurance Co. (collectively, "Underwriters") [26] and Defendants Thomas Raffanello and Bruce Perraud [23]. Because the Court holds that the change of control exclusion does not apply to imposition of a receivership, the Court denies Underwriters' motion and grants Defendants' motion.

### I. BACKGROUND

This is an insurance coverage dispute arising out of the Stanford Ponzi scheme. R. Allen Stanford orchestrated a $7 billion Ponzi scheme in which, through a network of corporations, he sold certificates of deposit to investors, promising above-market returns through his superior investment strategies. In fact, there was no investment strategy, just a criminal enterprise. On February 16, 2009, the Securities Exchange Commission ("SEC") commenced a civil action against Stanford and some of his associates and entities. On

ORDER – PAGE 1

motion of the SEC, this Court appointed a receiver that took control of Stanford's empire (the "Receivership Order").

Defendants were officers of Stanford Financial Group Company ("SFG"). Shortly after the Receiver was appointed, Defendants shredded some Stanford documents. Consequently they were indicted for various federal criminal charges arising out of the shredding. The evidence at trial showed that they shredded the documents out of concerns for customer confidentiality and only after the documents were electronically preserved, and thus they were acquitted.

Underwriters issued a Directors' and Officers' Liability and Company Indemnity Policy (the "D&O Policy") to SFG and some related entities. Underwriters also issued an excess policy that followed form, i.e., it incorporated the various insuring provisions, exclusions, conditions from the D&O Policy. The underlying D&O Policy is exhausted. This dispute is over whether Underwriters is obligated to pay Defendants' legal fees incurred in their criminal prosecution under the excess policy.[1]

The Court commends the parties for narrowing the issues in dispute. The parties have submitted the cross-motions on stipulated facts. The case comes down to a single legal issue: Does the Receivership Order trigger the change of control exclusion in the D&O Policy? Exclusion J of the D&O Policy provides:

> The Underwriters shall not be liable to make any payment for Loss resulting from any Claim based upon, arising out of, directly or indirectly resulting from

---

[1]Although the dispute is over the excess policy, because it is following form, the Court will refer to the D&O Policy in its analysis.

or in consequence of, or in any way involving, any Wrongful Act occurring
subsequent to the time that the earliest of the following events take place:
(1) Another entity or individual holds a majority of the voting rights in the
Parent Company.

## II. PRINCIPLES OF INSURANCE CONSTRUCTION

In one of the many Stanford-related appeals, the Fifth Circuit stated:

> Texas law applies; it requires us to construe insurance policies using the
> same rules of construction applicable to contracts generally. "Effectuating the
> parties' expressed intent," then, is our primary concern. If a policy uses
> unambiguous language, it must be enforced as written. But, if a policy is
> susceptible to more than one reasonable interpretation, "[t]his Court has clearly
> identified that Texas law requires an insurance policy to be construed against
> the insurer and in favor of the insured" – in other words, in favor of coverage.
> Where an exclusionary provision is ambiguous – that is, amenable to two or
> more reasonable interpretations – the court must adopt the construction urged
> by the insured so long as that construction is not unreasonable, even if the
> insurer's construction "appears to be more reasonable or a more accurate
> reflection of the parties' intent."

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 569 (5th Cir.

2010) (footnotes omitted).

Underwriters argue that the Court should apply the "sophisticated insureds" exception

and not construe the D&O Policy against them. In *Vought Aircraft Indus., Inc. v. Flavey*

*Cargo Underwriting Ltd.,* 729 F. Supp. 814 (N.D. Tex. 2010), another judge of this Court

determined that Texas would apply the sophisticated insured exception. *Id.* at 823-26.

> Texas courts have made clear that the traditional rule of construction is based
> on an insured's unequal bargaining power, the special relationship between the
> insured and the insurer, and the general principle that contracts are construed
> against the drafting party. *See Balandran v. Safeco Ins. Co. of Am.*, 972
> S.W.2d 738, 741 n. 1 (Tex.1998). Where the sophisticated insureds exception
> applies, these concerns are not in play. Such insureds draft the policy, or at
> least play a role in drafting it. They are not presented a policy that contains
> non-negotiable terms; rather, they can bargain for coverage. And they are able

ORDER – PAGE 3

to interpret the policy on their own, lessening the likelihood that the insurer will take advantage of them. Accordingly, considering that Texas applies principles that are congruous with the sophisticated insureds exception, the court holds that Texas courts would apply the exception where the facts warrant.

*Id.* at 824-25 (footnote omitted). Underwriters take this to mean that when a sophisticated insured engages in any negotiation regarding any policy language, the entire policy should not be construed against the carrier.

The Court believes Underwriters try to get too much out of the sophisticated insureds exception. The Court believes Texas courts would limit the exception to, at most, those portions of the policy that were the subject of negotiation, and not apply it to those portions of the policy that were standard form, drafted and imposed by the carrier.[2] This is consistent with "the general principle that contracts are construed against the drafting party." *Id.; see also* COUCH ON INSURANCE § 22:25 (3d ed. updated 2012) (sophisticated insureds exception applies "when it is not the insurer which is responsible for *the policy language at issue*") (emphasis added).

There is no evidence before the Court indicating that Stanford negotiated or drafted Exclusion J.[3] In fact the only evidence regarding any negotiations is the testimony of an Underwriters employee, who did not participate in the negotiations and was not aware of the

---

[2]There are at least two alternative formulations of the exception. The exception could apply to any provisions that was the subject of negotiation, regardless whose proposed language prevailed. Alternatively, the exception could apply only to those provisions where the insured's proposed language was adopted. Because the same result would apply here either way, the Court need not further guess which formulation Texas would follow.

[3]The Court will assume that Stanford is otherwise a sophisticated insured.

ORDER – PAGE 4

content of the negotiations, but was simply aware that some negotiations took place. *See* Underwriters' Reply App. 11-12. Exclusion J is found in the main body of the form policy, not in any negotiated endorsement. It thus appears that Underwriters drafter Exclusion J. The Court, then, will follow the standard Texas rules of construction in favor of coverage and against the insurer for Exclusion J.

### III. EXCLUSION J DOES NOT APPLY TO A RECEIVER

#### *A. The Receiver Holds Stanford's Voting Rights in SFG*

The parties initially dispute whether this Court's Receivership Order in *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-298 (Feb. 17, 2009), caused the Receiver to hold a majority of the voting rights in SFG (defined in the D&O Policy as the "Parent" for section one). The Receivership Order provides that the "Court assumes exclusive jurisdiction and takes possession of the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entitites), of the Defendants and all entities they own or control ('Receivership Assets') . . . ." Receivership Order ¶ 1. It further provided that "Ralph S. Janvey of Dallas Texas, is hereby appointed Receiver for the Receivership Assets and Receivership Records (collectively, 'Receivership Estate'), with the full power of an equity receiver under common law as well as such power as are enumerated herein as of the date of this Order." *Id.* ¶ 2. The Receivership Order goes on in great detail to enumerate the powers of the Receiver, including the duties to "[m]aintain full control of the Receivership Estate," *id.* ¶ 5(a), and

"[c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated . . . ." *Id.* ¶ 5(b).

Stanford, individually, was a Defendant subject to the Receivership Order. Stanford held, directly or indirectly, all of the stock of SFG. The SFG stock was thus part of the Receivership Estate, over which the Receiver was to maintain full control. The Court is confident that under its Receivership Order, the Receiver held the complete voting rights in SFG.[4]

### B. A Receivership Does Not Trigger Exclusion J

The fact that the Receiver held the voting rights does not end the inquiry. The salient fact here is that the voting rights were not held by Ralph S. Janvey individually, but rather by Ralph S. Janvey in his capacity as court-appointed receiver for R. Allen Stanford. A receiver is not quite the same as the person in receivership, but is also not entirely different from that person. It has long been held that an equitable receiver "stands in the shoes" of the person or entity in receivership. *See, e.g.*, *Janvey v. Democratic Senatorial Campaign Comm.*, — F.3d —, 2013 WL 110 4172, at *3 n.5 (5th Cir. 2013) ("the receiver, standing in the shoes of the corporation . . .") (quoting *In re Wiand*, 2007 WL 963165, at *2 (M.D. Fla. Mar. 27, 2007); *Securities and Exchange Comm. v. Spence & Green Chem. Co.*, 612 F.2d

---

[4]The Court notes that this is a question of federal receivership law, not Florida or Texas corporate law.

896, 903 (5th Cir. 1980) ("As a general rule, a receiver, standing in the shoes of management

. . . ."); *United States v. Sentinel Fire Ins. Co.*, 178 F.2d 217, 233 (5th Cir. 1950) (receiver

in bankruptcy "stands in the shoes of the bankrupt, as receiver of the latter's assets"); *Bank*

*of Commerce & Trust Co. v. Hood*, 65 F.2d 281, 282-83 (5th Cir. 1933) ("the receiver,

standing in the shoes of" mortgagor).  It is a plausible construction of Exclusion J that an

equitable receiver, standing in the shoes of R. Allen Stanford, is not "another entity or

individual" than R. Allen Stanford.  Because this is a plausible construction, and because the

Court must construe the exclusion against the carrier and in favor of coverage, the Court

must adopt that construction.[5]

This construction is consistent with other provisions in the Policy.  An equitable

receiver is a close cousin to a bankruptcy trustee.  *See, e.g.*, *In re Crown Vantage, Inc.*, 421

F.3d 963, 971 (9th Cir. 2005) ("'[t]he trustee in bankruptcy is a statutory successor to the

equity receiver,'" quoting *Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998)); *In re Fuzion*

*Tech. Group Inc.*, 332 B.R. 225, 236 (Bankr. S.D. Fla. 2005).  So, if Underwriters' argument

about the Receiver is correct, it would apply with equal force to a bankruptcy trustee.  But

the Policy expressly contemplates that it would remain in force if a bankruptcy trustee were

---

[5]This of necessity implies the Court finds Exclusion J to be ambiguous, given that an alternate construction would be Underwriters' proposal that anything or anyone that is not R. Allen Stanford personally is another entity or individual.  Underwriters complains that Defendants have not alleged ambiguity.  That does not prevent the Court from finding Exclusion J ambiguous.  "The interpretation of the contract and determination of ambiguity, however, is a matter of law, and the court 'may conclude that a contract is ambiguous even in the absence of such a pleading by either party.' " *In re Newell Indus., Inc.*, 336 F.3d 446, 449 n.5 (5th Cir. 2003) (quoting *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993)).

appointed for R. Allen Stanford. It provides that the definition of "Director(s) and Officer(s)" shall include "the estates, heirs, legal representatives or assigns of any such director or officer or employee or spouse thereof, solely in the event of their death, incapacity or bankruptcy." *See* Policy art. III, ¶ E(6). If the appointment of a bankruptcy trustee does not terminate the Policy, then neither should the appointment of a receiver.

> This construction is also consistent with the purpose of a change of control exclusion:
>
> If the insured entity experiences a change in control (such as through a merger or acquisition) so that it is not the surviving entity, the insured entity's D&O policy will not afford coverage for wrongful acts committed after the date the change in control occurs. The reasoning behind such a provision is that the risk originally underwritten by the insurer no longer exists. Once a merger or acquisition occurs, two classes of management are created: the management for the new company and the previous management. While the insurer had an opportunity to evaluate the risk presented by the previous management, it does not necessarily have knowledge of the new management and does not wish to automatically extend coverage to the new management.

CARRIE E. COPE, NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE § 37.10[4] (2012). The appointment of a receiver does not adversely affect the risk insured under a D&O policy. If anything, it radically reduces any such risk, as the receiver's job is usually to wind down the business. Thus, in this case, the appointment of the Receiver does not implicate the reasons Underwriters sought to exclude coverage following a change in control.

Finally, this construction is consistent with the public policy supporting a receiver's ability to marshal the assets of the receivership estate. As discussed above, *see supra* Part III.A, the Receivership Order is quite broad. Under its plain terms, the Policy is part of the Receivership Estate if Exclusion J is not triggered. If Exclusion J is triggered by appointment of the Receiver, it acts as an "ipso facto" clause, that is a contractual clause that

purports to terminate or otherwise specify the consequences under a contract upon the event

of insolvency.  Because ipso facto clauses prevent a receiver or bankruptcy trustee from

marshaling the assets of the estate, they are disfavored.  This is reflected by statute in the

bankruptcy and FDIC context.  *See* 11 U.S.C. §§ 365(e)(1), 541(c); 12 U.S.C. §

1821(e)(13)(A), (B)[6]  On this point FIRREA, Pub. L. 101-73, simply codified existing

common law.  "Contracts often have a provision specifying that the contract is automatically

---

[6]This section expressly excluded D&O policies and certain bonds from its scope and left those contracts to be addressed by pre-FIRREA law.  The D&O exception in FIRREA does not reflect a Congressional policy in *favor* of ipso facto clauses in D&O policies, but rather an intent to leave the issue of their enforceability to the courts:

> The exception for directors and officers liability contracts and financial institution bonds is intended neither to expand nor diminish the rights of insured institutions, their insurers, or conservators or receivers.  A conservator or receiver or insurer retains the right to litigate the enforceability of coverage exclusions such as those described above that state that upon appointment of a receiver coverage will be terminated.  Courts shall continue to address provisions in such contracts and bonds under existing law.  This provision is in no way intended to affect or alter the law with respect to directors and officers liability insurance contracts or financial institution bonds. . . .
>
> Current law
>
>     The majority of courts which have considered the provisions in contracts which provide that coverage terminates upon appointment of a receiver have found such provisions to be against public policy and therefore unenforceable.  In a recent case, the Court held that such a clause "substantially hinders FSLIC's exercise of its federal powers and therefore is contrary to federal policy."

H. Rep. No. 101-54(I), at 416 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 213 (quoting *Branning v. CNA Ins. Cos.*, 721 F. Supp. 1180, 1184 (W.D. Wash. 1989)).  *Accord* S. Rep. No. 101-19, 101 Cong. Rec. S6907, 6911 (daily ed. June 19, 1989) (discussing Section 212(B) paragraph (9)) (available on Westlaw, database FIRREA-LH).

in default on the appointment of a receiver or conservator, or similar event.  Such provisions

are generally held void and section [1821(e)] merely codifies the common law rule." *Bank*

*of New York v. F.D.I.C.*, 453 F. Supp. 2d 82, 96 (D.D.C. 2006) (quoting 101 Cong. Rec.

S2381 (daily ed. Mar. 8, 1989) (statement of Sen. Garn)); *cf. Bank One, Tex., N.A. v.*

*Prudential Ins. Co.*, 878 F. Supp. 943, 965 (N.D. Tex. 1995) (noting pre-FIRREA common

law authority of FDIC to abrogate ipso facto clauses in limited circumstances).  By

construing Exclusion J not to apply to appointment of a receiver, the Court is acting

consistently with Congressional policy disfavoring ipso facto clauses; this has the additional

advantage of avoiding the difficult question of whether Exclusion J would be void as an ipso

facto clause if it applied to appointment of a receiver.

### CONCLUSION

Because the Court construes Exclusion J not to apply to appointment of a receiver, the

Court grants Defendants Raffanello and Perraud's motion for summary judgment and denies

Underwriters' motion for summary judgment.

Signed May 13, 2013.

_____
David C. Godbey
United States District Judge

ORDER – PAGE 10